IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO FARM & LIVESTOCK BUREAU;
NEW MEXICO CATTLE GROWERS'
ASSOCIATION; and NEW MEXICO FEDERAL
LANDS COUNCIL,

      Plaintiffs,

v.                                                          No. 2:15-cv-00428-KG-CG

UNITED STATES DEPARTMENT OF THE
INTERIOR; SALLY JEWELL, in her official capacity
as Secretary of the United States Department of the
Interior; UNITED STATES FISH AND WILDLIFE
SERVICE; and DANIEL M. ASHE, in his official
capacity as Director of the United States Fish and
Wildlife Service,

      Defendants,

CENTER FOR BIOLOGICAL DIVERSITY, INC. and
DEFENDERS OF WILDLIFE, INC.,

      Defendant - Intervenors.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs New Mexico Farm & Livestock Bureau, New Mexico Cattle Growers' Association, and New Mexico Federal Lands Council's (Plaintiffs) petition for judicial review of the United States Fish and Wildlife Service's (Service) final agency action designating critical habitat for the jaguar in portions of Arizona and New Mexico. *See* (Docs. 1, 69). Having reviewed the briefing and being fully advised, the Court denies Plaintiffs' petition for injunctive relief and affirms the Service's final agency action.

1

I.       Procedural History

On March 5, 2014, the Service published its final agency rule designating approximately 764,207 acres of land in New Mexico and Arizona as critical habitat for the jaguar under the Endangered Species Act (ESA).  79 Fed. Red. 12,571. Plaintiffs initiated suit in this Court on May 20, 2015, by filing a petition seeking declaratory judgment and injunctive relief.  (Doc. 1). On October 31, 2016, Plaintiffs filed their opening brief in support of their petition.[1]  (Doc. 69). Defendants and Defendant-Intervenors each filed their own response on December 12 and December 19, 2016, respectively.  (Docs. 70, 71).  Plaintiffs filed their reply on January 13, 2017, and submitted a notice of completed briefing on February 3, 2017.  (Docs. 73, 75).

II.      Factual Background

The jaguar (*Panthera oncus*) is a large, territorial predatory cat with a camouflaged appearance of either pale yellow, tan, or reddish yellow with prominent dark rosettes or blotches. *See* R003476; 79 Fed. Reg. at 12,581.  The core habitat, which most jaguar occupy, consists of the tropical rain forests of Central and South America.  *See* Administrative Record (AR) F000373. However, at the northernmost portion of the jaguar's range, a small population has adapted to occupy more arid forest and open grass ecosystems.  79 Fed. Reg. at 12,573.  This includes a breeding population of resident jaguars in Sonora, Mexico as well as individual jaguars in the southwestern United States.  The ecosystems in the United States are considered suitable only as a secondary habitat, which has little to no evidence of reproduction but which may provide important dispersal habitat for the species.  AR R003492-93.

---

[1] Plaintiff-Intervenors Arizona and New Mexico Coalition of Counties for Stable Economic Growth, Jim Chilton, Pima Natural Resource Conservation District, and Southern Arizona Cattlemen's Protective Association filed a notice of voluntary dismissal of their intervenor complaint on October 27, 2016.  *See* (Doc. 66).

2

The Service listed the jaguar as endangered under the ESA in 1972.[2] 37 Fed. Reg. 6,476 (Mar. 30, 1972); AR F000001. The Service recognized in 1980 that it was "unlikely that a jaguar will wander into the United States in the near future" and "even more unlikely that a population could become established in the American southwest," due to the fact that a jaguar had not been seen in New Mexico since 1937. *See* 45 Fed. Reg. 49,845; 59 Fed. Reg. 35,674, 35,676 (July 13, 1994); AR F000004, AR F000009. However, between 1996 and 2006, two jaguars were sighted in portions of Hidalgo County, New Mexico. AR F000379-80; 79 Fed. Reg. at 12,594, 12,580-81.

On August 20, 2012, the Service solicited public comments on a proposed rule to designate approximately 838,232 acres of land as jaguar critical habitat in New Mexico and Arizona. 77 Fed. Reg. 50,214. The Service published its Final Rule on March 5, 2014, designating approximately 764,207 acres of land in New Mexico and Arizona as critical habitat for the jaguar. 79 Fed. Reg. 12,571. Of the six designated units, Units 5 and 6, the subjects of this lawsuit, cover areas within the state of New Mexico and part of Arizona.

Unit 5 stretches across 102,724 acres in Hidalgo County, New Mexico, and Cochise County, Arizona, including portions of the Coronado National Forest, and 13,138 acres of privately owned land. 79 Fed. Reg. at 12,592. One jaguar track was photographed within this Unit near the New Mexico-Arizona state border in 1995, and a jaguar was sighted in this Unit in 1996. *Id.*; 79 Fed. Reg. at 12,580, Table 1 (entries for 1995 and 1996). Unit 6 includes 7,714

---

[2] Intervenor-Defendants argue that, while the 1972 listing covered endangered populations in Mexico and Central/South America, jaguars were not listed as endangered within the United States until 1997. (Doc. 71) at 7. However, both Plaintiffs and Defendants agree with the Service's determination that the 1972 listing was intended to cover Jaguars across their entire range, including the portion extending into the United States. *See* (Doc. 69) at 13; (Doc. 70) at 11; 79 Fed. Reg. at 12,578-82. Accordingly, the Court will treat 1972 as the relevant date of listing.

acres of entirely private property in Hidalgo County, New Mexico. 79 Fed. Reg. at 12,594, AR F000394. One jaguar was photographed in this Unit in 2006. 79 Fed. Reg. at 12,580, Table 1 (entry for 2006), AR F000380.

III. Legal Standard: Review of a Final Administrative Decision

Plaintiffs seek review of the Service's final agency decision, asserting that the Service exceeded its authority in designating thousands of acres of arid land in New Mexico as critical habitat for the jaguar. Accordingly, Plaintiffs request declaratory judgment and injunctive relief against Defendants for violating the ESA, 16 U.S.C. § 1531, *et seq.*; 50 C.F.R. § 424.12(e)[3]; and the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq*.

A. Administrative Procedure Act

Under the APA, a reviewing district court must set aside an agency action that (a) fails to meet statutory, procedural, or constitutional requirements, or (b) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(D). The Court possesses jurisdiction over an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. This review functions as an appeal and should be based on the administrative record before the agency at the time the agency made its decision. 5 U.S.C. § 706(2)(A); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994). (determining that reviewing court may not rely on evidence outside the record under APA). An agency's decision is entitled to a "presumption of validity," and will be upheld if the agency considered the relevant factors and provided a reasoned basis for its decision. *Citizens' Comm.*

---

[3] This federal regulation details the authority and criteria used by the Secretary in designating critical habitat for an endangered species under the ESA.

4

*to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999).

    B.  The Endangered Species Act

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b); s*ee N.M. Cattle Growers Ass'n v. U.S. Fish and Wildlife Serv.*, 248 F.3d 1277, 1282 (10th Cir. 2001) (same). The first step in protecting a species is for the Secretary of the Interior (Secretary), who has responsibility to list a species in need of protection as either "threatened" or "endangered." 16 U.S.C. § 1533(a). The ESA also requires the Secretary to designate critical habitat for all listed species, to the extent prudent and determinable, as a means of conserving the species. 16 U.S.C. § 1533(a)(3)(A). The designation must be based on "the best scientific data available" and may only be made after the Secretary considers and weighs the cost of all relevant impacts, including economic impacts. 16 U.S.C. 1533(b)(2); 50 C.F.R. § 424.12(a). Under this standard, the Secretary may designate both occupied and unoccupied territories as critical habitat, but the standard imposes "a more onerous procedure on the designation of unoccupied areas by requiring the Secretary to make a showing that unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010); *see* 16 U.S.C. § 1532(5)(A).

IV.    Standing

Before a federal court may declare legal rights and grant requested relief, the party invoking the court's authority must demonstrate all elements of Article III standing. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982). Article III standing is established by showing an injury in fact which is fairly traceable to defendants with a likelihood that the requested relief will redress the alleged injury. *See Steel*

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining requirements for justiciable case and controversy). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Standing may be established by affidavits demonstrating particularized injury to individual members of an organization. *See, e.g., Riverkeeper v. Taylor Energy Co., LLC*, 113 F. Supp. 3d 870, 875 (E.D. La. 2015) (finding evidence of associational standing based on affidavits of individual organization members).

Here, each of the Plaintiff organizations assert standing on the basis that individual members have suffered or will suffer an injury in fact from the Service's final action declaring Units 5 and 6 as critical habitat for the jaguar. In support of this assertion, Plaintiffs have provided sworn declarations from Chad Smith, the CEO of New Mexico Farm & Livestock Bureau, and Caren Cowan, the Executive Director of Cattle Growers and an Authorized Representative of the New Mexico Federal Lands Council. (Doc. 69-2); (Doc. 69-3). These declarations state that members of each organization are property owners, cattle ranchers, and business operators within Units 5 and 6 who will be subject to costly and time consuming compliance procedures as a result of the regulatory action. (Doc. 69-2) at 2-3; (Doc. 69-3) at 2.

Further, Plaintiffs have provided specific declarations of individual members who claim personal injury in fact as a result of the Service's designation of Units 5 and 6 as critical habitat for the jaguar. Meira Gault, a member of two of the Plaintiff organizations, is a trustee of a revocable trust that owns Midbar Ranch and property adjacent to land designated as jaguar

critical habitat. (Doc. 73-2). Levi Klump, a member of all three Plaintiff organizations, owns a ranch and holds a federal grazing permit on federal land designated as jaguar critical habitat. (Doc. 73-1). According to their declarations, the renewal of federal grazing permits will be subject to consultation under the ESA, as will any future planned improvements to their land, such as corrals, stock ponds, additional fencing or other structures. *Id.*

The threat of direct regulation constitutes sufficient harm to confer standing to challenge government action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) (holding that standing to challenge government action depends upon whether plaintiff is himself object of regulation). Further, the ESA contains specific provisions allowing any party to challenge the manner in which the ESA is enforced, even if plaintiffs seek to limit the scope of the regulation. *See* 16 U.S.C. § 1540 (g); *Bennett v. Spear*, 520 U.S. 154, 166 (1997) (allowing ranch operators to bring ESA citizen-suit even though they sought to prevent regulation). Accordingly, the declarations describe with adequate specificity the injuries of individual members necessary to confer associate standing to Plaintiff organizations. The Court, thus, turns to the merits of Plaintiffs' petition.

V. Analysis: Designation of Critical Habitat

A. Whether Jaguars Occupied Units 5 and 6

The first step of the review is to determine whether the designated critical habitat was occupied by the species which the designation was meant to protect. 16 U.S.C. § 1532(5)(A). This inquiry focuses on whether the habitat was occupied at the time of listing. *See* 16 U.S.C. § 1532(5)(A)(i); 79 Fed. Reg. at 12,581. As an initial matter, the parties disagree as to the definition of the term "occupied" under the ESA. Plaintiffs contend that the mere presence of solitary, individual jaguars does not render an area occupied without evidence of a resident population. (Doc. 69) at 11, 22; (Doc. 73) at 19. By contrast, the Service asserts that the term

7

"occupied" varies on a case-by-case basis and, in this instance, is satisfied if the designated area is one where jaguar are likely to be present. (Doc. 70) at 23-24, 27. The term "occupied" as used in the ESA has been found to be ambiguous and not plainly defined thus granting deference to the Service's definition of the term. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 708 (1995); *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 119-20 (D.D.C. 2004) (applying *Chevron* deference to Service definition of "occupied" habitat). Further, Courts have upheld the Service's definition of "occupied" as an area where a species is likely to be found. *See Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1165, 1167 (holding that Service has "authority to designate as 'occupied' areas that [a species] uses with sufficient regularity that it is likely to be present during any reasonable span of time" but "may not determine that areas unused by [a species] are occupied merely because those areas are suitable for future occupancy"). Hence, a designated area may be considered "occupied" if individual members of the protected species are likely to be found there, whether or not the area holds a resident breeding population.

As noted above, the Service's listing of jaguars under the ESA occurred in 1972. The Service used the jaguar's ten-year average lifespan to conclude that the observance of a jaguar any time within a ten-year period of the designation would constitute evidence that the habitat was occupied at the time of listing. 79 Fed. Reg. at 12,581, AR 000381. However, the only evidence in the record of jaguar sightings in the relevant areas are: one historical sighting in Unit 5; one sighting in Unit 5 in 1996; and one sighting in Unit 6 in 2006. (AR R002258-60, 002263-64 (Robinson *et al*., 2006 report detailing historical jaguar observations in New Mexico); (AR F000380 and 79 Fed. Reg. at 12,594, 12,581, citing 1996 jaguar sighting in Peloncillo Mountains located in Unit 5); (AR F000379 and 79 Fed. Reg. at 12,594, 12,580, citing 2006 sighting in

"north end of San Luis Mountains" in Unit 6). None of these sightings occurred within a ten-year period before or after the 1972 jaguar listing date under the ESA. Despite this lack of direct evidence, the Service proffered that, given the lack of survey effort around the time of listing, as well as the difficulty in detecting jaguars generally, lack of detection in a particular area did not indicate that jaguars were necessarily absent from a particular area at the time of listing. 79 Fed. Reg. at 12,582. Nevertheless, the Service explicitly acknowledged its uncertainty regarding whether Units 5 and 6 were "occupied." *See* (Doc. 70) at 30. Indeed, the Service expressed skepticism at such occupation shortly after the listing, concluding that it was unlikely that a jaguar population would become established in the American southwest or even that individual transitory jaguars "will wander into the United States in the near future." 45 Fed. Reg. 49,845; AR 000004. This opinion was based on the fact that, between 1937 and 1996, there were no jaguar sightings anywhere within New Mexico. *See* 59 Fed. Reg. 35,674, 35,676 (July 13, 1994); AR F000009. Despite the deference owed to the Service on matters of scientific expertise, the reviewing court cannot simply accept the truism that a particular species is elusive by nature as a substitute for concrete evidence to conclude that the relevant habitat was occupied at the time of listing. *See, e.g*, *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1244 (9th Cir. 2001) (finding arbitrary and capricious Service's determination that area was occupied based on speculation rather than direct evidence of species' presence). Consequently, the Court must turn to the standard for determining whether an unoccupied area may nevertheless be designated a critical habitat.

B. Whether Unoccupied Units Are Essential to Conservation

As noted above, the ESA allows designation of a critical habitat even if the area is not occupied by the listed species if the land is considered "essential for the conservation of the

9

species." *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1163. This critical habitat designation can apply to the protection of a species' population which occupies the area at present, even if the area was considered unoccupied at the time of listing. *See Otay Mesa Prop., L.P. v. United States Dep't of the Interior,* 144 F. Supp. 3d 35, 60 (D.D.C. 2015) (upholding critical habitat determination for stock pond which supports fairy shrimp reproduction). However, with limited exceptions, a critical habitat designation may not include the entire geographical area which can be occupied by the threatened or endangered species. 16 U.S.C. § 1532(5)(c).

Here, Defendants contend that, even in the event that the designated area was unoccupied at the time of listing, that area remains essential to the conservation of the jaguar and, thus, constitutes a critical habitat. (Doc. 70) at 30-34. Defendants concede that the biomes of the designated New Mexico Units are not a part of the jaguars' core habitat and are suitable only as secondary habitat, which has little to no evidence of reproduction but can provide important dispersal habitat for the jaguar. *Id*. at 31. However, Defendants contend that the preservation of secondary habitats as part of the conservation plan contributes to the jaguars' persistence by supporting range expansion and genetic exchange. *Id*. at 31-32. Specifically, Defendants claim that populations at the outer periphery of the jaguars' range possess genetic and demographic diversity which allow them to inhabit the distinct arid environments of its secondary habitat, a key component for adaptability which ensures the species' survival. *Id*. In essence, Defendants assert that the small populations capable of inhabiting the arid environments of northern Mexico and the American southwest are critical to the species survival precisely because they are adapted to exist outside the jaguars' core habitat. *Id*. at 33-34.

In support of its critical habitat designation, the Service relied on jaguar sightings in 1996 and 2006 to demonstrate that Units 5 and 6 are habitable and presently in use by the species. *See*

AR F000389; 79 Fed. Reg. at 12,594, 12,580-81. Further, the Service relied on the scientific opinion of a team of experts contained in the jaguar Recovery Outline to determine that protection of core habitat is insufficient to the conservation of the species and to explain why protection of the small populations located in the secondary habitat on the edge of the jaguars' range was essential to the adaptability (and thus conservation) of the species. *See* 79 Fed. Reg. at 12,573; AR F000373-74; AR R002484 (conserving jaguars requires "at least, saving populations of the species in all the significantly different ecological systems in which they occur. . . it is not sufficient to pursue jaguar conservation efforts only in tropical forests"). Indeed, federal Courts have previously upheld the determination of critical habitat based on a similar rationale. *See, e.g.*, *Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1367 (N.D. Fla. 2009) (upholding designation of critical habitat for area which allows dispersal movements and maintains genetic diversity in isolated portions of species' range).

Plaintiffs contend that this critical habitat designation serves as an overly-extensive buffer. Plaintiffs further contend that the Service's ends could be achieved simply by preserving the breeding population 130 miles south of the United States-Mexico border, which has adapted to surviving in an arid ecosystem similar to the Units in the American southwest. (Doc. 69) at 21; *see also* (Doc. 71) at 6 (describing similar ecological conditions in Sonora, Mexico). While this breeding population arguably plays a larger part in the species' adaptability to secondary habitats, it is not the reviewing Court's role to reevaluate *de novo* the importance of the designated critical habitat. Rather, the Service's designation of Units 5 and 6 is based on analysis of relevant data and rationally connected to evidence demonstrating the importance of preserving populations in the secondary habitat at the edge of the jaguars' northern range. This Court concludes the decision is neither arbitrary nor capricious and defers to the Service's scientific

determination that critical habitat designation in the American southwest is critical for range connectivity to adjacent habitable land in Mexico. *See* AR R002441-82; AR R002430-40; (Doc. 70) at 39-40.

      C.   Whether the Service Failed to Make a Threshold Determination

Alternatively, Plaintiffs argue that the Service's rationale for designating Units 5 and 6 as critical habitat is incomplete because it fails to identify the point at which jaguars will no longer be considered a threatened species in need of regulatory protections. (Doc. 69) at 25-27. Plaintiffs contend that, as a result of this failure, the Service's final rule is lacking a threshold determination necessary to designate critical habitat under the ESA. *Id.*

The ESA defines critical habitat as those areas "essential to the conservation of the species" and describes conservation as use of methods to bring a species to "the point" at which protections are no longer required. 16 U.S.C. §§ 1532(3), 1532(5)(A)(i)-(ii). Plaintiff misread the ESA. Indeed, the ESA does not impose a threshold requirement that the Service identify at the time of critical-habitat designation a specific viable population size and minimum habitat necessary to sustain that population. *See, e.g., Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F. 3d 452, 469 (5th Cir. 2016) ("The ESA's critical-habitat provisions do not require the Service to know when a protected species will be conserved as a result of the designation"). Rather, the statute instructs the Secretary to determine the point at which a species is conserved during the development and implementation of a recovery plan, an action separate from the critical habitat designation phase. *See* 16 U.S.C. § 1533(f)(1)(B)(ii). Because the statute does not require knowing when a species is conserved during the critical habitat designation phase, the final rule's exclusion of this analysis does not invalidate the designation of Units 5 and 6 as critical habitat for the jaguar.

VI. Conclusion

For the foregoing reasons, the Court finds that the Service's determination that the designated areas in Units 5 and 6 were essential to the conservation of the jaguar species was not arbitrary and capricious under the APA. Consequently, the Court affirms the Service's determination to designate Units 5 and 6 as critical habitat for the jaguar.

IT IS THEREFORE ORDERED that Plaintiffs' petition to overturn the final agency rule (Doc. 69) is **DENIED** and the Service's final decision is **AFFIRMED**.

_____
UNITED STATES DISTRICT JUDGE