IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO FARM & LIVESTOCK
BUREAU; NEW MEXICO CATTLE
GROWERS' ASSOCIATION; and NEW
MEXICO FEDERAL LANDS COUNCIL,

      Plaintiffs,

vs.                                                                    Civ. No. 15-428 KG/CG

UNITED STATES DEPARTMENT OF THE
INTERIOR; RYAN ZINKE, in his official
capacity as Secretary of the United States
Department of the Interior; UNITED STATES
FISH AND WILDLIFE SERVICE; and
DANIEL M. ASHE, in his official capacity as
Director of the United States Fish and Wildlife
Service,

      Defendants,

CENTER FOR BIOLOGICAL DIVERSITY
and DEFENDERS OF WILDLIFE,

      Defendant-Intervenors.

MEMORANDUM OPINION AND ORDER

This administrative review case involves Defendant United States Fish and Wildlife Service's (Service) Final Rule designating critical habitats for the jaguar in New Mexico under the Endangered Species Act (ESA). Plaintiffs filed this lawsuit in 2015, asserting that the Service's New Mexico critical habitat designations were arbitrary and capricious. The Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (judicial review of agency action); 16 U.S.C. § 1540(c) (ESA actions); 16 U.S.C. § 1540(g) (citizen suits arising under ESA); and 28 U.S.C. § 1331 (federal question jurisdiction).

In October 2017, the Court ruled in favor of the Service. (Docs. 76 and 77). Plaintiffs appealed that decision in December 2018. (Doc. 78). In March 2020, the Tenth Circuit Court of Appeals reversed the Court's ruling and remanded the case to the Court "for proceedings consistent with this decision." *New Mexico Farm and Livestock Bureau v. United States Dept. of Interior*, 952 F.3d 1216, 1233 (10th Cir. 2020). The Court, therefore, invited the parties to submit a Stipulated Judgment. (Doc. 87). If the parties could not agree on a Stipulated Judgment, the Court ordered the parties to submit briefing on the issue of an appropriate remedy. *Id.* In fact, the parties could not agree to a Stipulated Judgment.

The parties have now timely briefed the issue of an appropriate remedy. (Docs. 88, 89, 90, 91, 92, 93, and 94). Having considered the briefing, the controlling law, and for the following reasons, the Court grants Plaintiffs' request to vacate the New Mexico critical habitat designations for the jaguar.

I. Background

  A. *The Jaguar Critical Habitat*

Jaguar habitat extends from South America north to the United States/Mexico borderlands area. 79 Fed. Reg. 12,573 (Mar. 5, 2014). "[J]aguars show a high affinity for lowland wet communities, including swampy savannas or tropical rain forests toward and at middle latitudes," which occur in Central and South America. *Id.* Hence, "the most robust jaguar populations have been associated with tropical climates in areas of low elevation with dense cover and year-round water sources." *Id.* Jaguars "are rarely found in extensive arid areas" like those found in the United States/Mexico borderlands area. *Id.*

In 1972, the Service listed the jaguar as an endangered species. *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1225. "In 2014, the Service published a final rule designating

764,207 acres in New Mexico and Arizona as critical jaguar habitat." *Id.* at 1220. "The area was divided into six units." *Id.* Unit 5, the Peloncillo Unit, and Unit 6, the San Luis Unit, "are the subject of this litigation." *Id.* Unit 5 covers 102,724 acres in both New Mexico and Arizona while Unit 6 covers 7,714 acres in New Mexico. *Id.* Units 5 and 6 are part of the larger Northwestern Recovery Unit that "include[s] jaguar habitat in the United States and northwestern Mexico." *Id.* at 1232.

"The Northwestern Recovery Unit comprises only a small portion of the jaguar's range and is divided into so-called 'core' and 'secondary' areas." *Id.* Core areas contain "evidence of consistent jaguar presence and recent reproduction, whereas secondary areas are characterized by recent records of jaguar presence but little evidence of reproduction." *Id.* Units 5 and 6 are "part of the Borderlands Secondary Area; the nearest core area-the Sonora Core Area-is about 130 miles south of the U.S.-Mexico border." *Id.*

In the Final Rule, the Service described the Borderlands Secondary Area as a "more open, dry habitat … [that] has been characterized as marginal habitat for jaguars in terms of water, cover, and prey densities." *Id.* (citation omitted). Significantly, "there is no evidence that jaguars were present in Units 5 and 6 at any time before 1995." *Id.* at 1227. The Service "list[ed] three jaguar sightings in Units 5 and 6: a jaguar track in Unit 5 in 1995, a photograph of a jaguar in Unit 5 in 1996, and a photograph of a jaguar in Unit 6 in 2006." *Id.* at 1226. In fact, the Service stated that "researchers anticipate that recovery of the entire species will rely primarily on actions that occur outside of the United States" since "such a small portion" of the jaguar's range "occurs in the United States…." 79 Fed. Reg. at 12,574.

Nevertheless, the Service stated in the Final Rule that areas within the Borderlands Secondary Area "support some individuals during dispersal movements, provide small patches of

3

habitat (perhaps in some cases with a few resident jaguars), and provide areas for cyclic expansion and contraction of the nearest core area and breeding population … south of the U.S.-Mexico border…." *Id.* The Service explained that an independent peer review stated individual jaguars "dispersing into the United States are important because they occupy habitat that serves as a buffer to zones of regular reproduction and are potential colonizers of vacant range, and that, as such, areas supporting them are important to maintaining normal demographics, as well as allowing for possible range expansion." *Id.*

### B. The ESA

The ESA requires the Secretary of the United States Department of Interior (Secretary) to keep "a list of all species determined … to be endangered species…." 16 U.S.C. § 1533(cc)(1). Once listed as an endangered species, the "ESA sets forth a procedure by which the Service designates critical habitat for endangered species." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1221. The ESA defines critical habitat for an endangered species in two ways: occupied critical habitat and unoccupied critical habitat. 16 U.S.C. § 1532(5)(A).

An occupied critical habitat exists in "specific areas within the geographical area occupied by the species, at the time it is listed … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection…." 16 U.S.C. § 1532(5)(A)(i).

An unoccupied critical habitat exists in "specific areas outside the geographic area occupied by the species at the time it is listed … upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Before designating an area unoccupied critical habitat, the Service's regulation requires that the Service first "find designation of occupied critical habitat 'inadequate to ensure the conservation of the

species.'" *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1228 (quoting 50 C.F.R. § 424.12 (2013) (stating that "Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species")).

Conservation "mean[s] to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). "[C]onservation encompasses recovery." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1227 (citation omitted).

C.  *The Service's Critical Habitat Designations*

The Service found that jaguars occupied Units 5 and 6 at the time the Service listed the jaguar as an endangered species in 1972. *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1221. Consequently, the Service "found the Units satisfied the ESA's requirements for occupied critical habitat but noted there was substantial uncertainty in the finding that the Units were occupied." *Id.* As a result of this substantial uncertainty, the Service "alternatively determined that the Units qualified as unoccupied critical habitat under the ESA." *Id.*

The critical habitat designations require that certain activities occurring on Unit 5 and Unit 6 "may require special management …, for example, habitat clearing, the construction of facilities, expansion of linear projects that may fragment jaguar habitat, some fuels-management activities, and some prescribed fire." 79 Fed. Reg. at 12,594.

D.  *The Lawsuit*

Plaintiffs challenged both the occupied and unoccupied critical habitat determinations for Unit 6 and the New Mexico portion of Unit 5 as arbitrary and capricious. Plaintiffs sued the

United States Department of the Interior, the Secretary, the Service, and the Service's Director. The current intervenors are Defendant-Intervenors Center for Biological Diversity and Defenders of Wildlife.

In ruling in favor of the Service, this Court determined that the Service's occupied critical habitat determination was arbitrary and capricious but that its alternative unoccupied critical habitat determination was not arbitrary and capricious, and, thus, legally valid. On appeal, the Tenth Circuit "agree[d] with the district court that the Service's designation of Units 5 and 6 as occupied critical habitat was arbitrary and capricious." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1227. The Tenth Circuit, however, disagreed with this Court's ruling regarding the Service's unoccupied critical habitat determination.

In reversing the Court's decision as to the Service's unoccupied critical habitat determination, the Tenth Circuit observed that the Service acknowledged in its Final Rule "that the lack of jaguar sightings at the time the species was listed as endangered in 1972 … suggest[ed] that jaguars in the United States had declined to such an extent by that point as to be effectively eliminated." *Id.* at 1231 (quoting 79 Fed. Reg. at 12,588). Nevertheless, as the Tenth Circuit noted, the Service indicated:

> To the extent that areas described above may not have been occupied at the time of listing, we determine that they are essential to the conservation of the species for the following reasons: (1) They have demonstrated recent (since 1996) occupancy by jaguars; (2) they contain features that comprise suitable jaguar habitat; and (3) they contribute to the species' persistence in the United States by allowing the normal demographic function and possible range expansion of the proposed Northwestern Recovery Unit, which is essential to the conservation of the species.

*Id.* (quoting 79 Fed. Reg. at 12,588).

The Tenth Circuit, however, found that to the extent jaguars occupied any Units in 1972 the Service failed "to find that their designation as critical habitat was inadequate to ensure

jaguar conservation before it designated Units 5 and 6, which were unoccupied, as critical habitat." *Id.* at 1231. In addition, the Tenth Circuit found that the Service did not "make findings about whether any individual unit designated as unoccupied was essential for the conservation of the species. Rather, it addressed all the units together, finding that to the extent they were not occupied, they were essential for the conservation of the species." *Id.* Accordingly, the Tenth Circuit concluded that the Service failed to comply with Section 424.12(e) (2013), it own regulation, by not "designat[ing] unoccupied critical habitat 'only when a designation limited to its present range would be inadequate to ensure the conservation of the species.'" *Id.* (quoting 50 C.F.R. § 424.12(e) (2013)). The Tenth Circuit, therefore, determined that "[b]ecause [the Service] did not follow its own regulations or provide a rational explanation for failing to do so, its designation of Units 5 and 6 as critical habitat was arbitrary and capricious." *Id.*

Although the Tenth Circuit found in Plaintiffs' favor, the Tenth Circuit, nonetheless, disagreed with Plaintiffs' argument "that because Units 5 and 6 are 'secondary,' 'marginal' habitat and constitute only a small portion of the jaguar's range, they cannot be essential for the conservation of the species." *Id.* at 1231-32. The Tenth Circuit observed that

> the Service stated that the areas designated as critical habitat contribute to jaguar conservation because they "support some individuals during dispersal movements, provide small patches of habitat (perhaps in some cases with a few resident jaguars), and provide areas for cyclic expansion and contraction of the nearest core area." [79 Fed. Reg.] at 12,574. Jaguars "dispersing into the United States are important," the Service explained, "because they occupy habitat that serves as a buffer to zones of regular reproduction and are potential colonizers of vacant range." *Id.* "[A]s such, areas supporting them are important to maintaining normal demographics, as well as allowing for possible range expansion." *Id.* The agency also found that "the Northwestern Recovery Unit is essential for the conservation of the species," and that "[c]ritical habitat in the United States contributes to recovery across the species' entire range." *Id*. at 12,574, 12,605.

7

*Id.* at 1232.  The Tenth Circuit, thus, held that "[i]n [its] view, it is not inconsistent for the Service to find both that Units 5 and 6 are 'secondary' or 'marginal' habitat and that they are essential for the conservation of the jaguar."[1]  *Id.*

For the above reasons, the Tenth Circuit reversed the Court's ruling with respect to the unoccupied critical habitat designation and remanded the case to the Court "for proceedings consistent with this decision."  *Id.*

## II. The Parties' Positions on the Appropriate Remedy

Plaintiffs ask the Court to "vacat[e] the designation of Unit 6 and the New Mexico portion of Unit 5 as jaguar critical habitat, provided that the Arizona critical habitat designations are left in place."  (Doc. 88) at 2.  Defendants state that while they "do not agree with many of the legal and factual arguments asserted by Plaintiffs … , [they] do not oppose Plaintiffs' proposed remedy."  (Doc. 89) at 2.  In light of that non-opposition, Plaintiffs submitted a "[Proposed] Stipulated Judgment Regarding Remedy."  (Doc. 88-1).

Defendant-Intervenors, however, oppose Plaintiffs' requested remedy.  Instead, Defendant-Intervenors "request that this Court remand the New Mexico portions of the jaguar's critical habitat designation to the Service without vacatur for further consideration consistent with the Tenth Circuit's opinion."  (Doc. 90) at 11.  In other words, Defendant-Intervenors request that Unit 6 and the New Mexico portion of Unit 5 remain designated critical habitat for

---

[1] The Tenth Circuit also rejected Plaintiffs' argument that the definition of conservation requires the Service to identify the "point at which the measures provided pursuant to this chapter are no longer necessary," which the Service did not do when it designated the jaguar's critical habitat. *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1232 (quoting 16 U.S.C. § 1532(3)).  The Tenth Circuit held that "the ESA does not require the Service to identify the point at which a species will be considered to have recovered when it designates critical habitat for that species."  *Id.* at 1233.

8

the jaguar pending the Service's reconsideration of its critical habitat designation upon remand. *See id.* at 2.

*III. Discussion*

The Court begins its discussion of the remedy issue with an examination of the Administrative Procedure Act (APA).[2] The APA states that if an agency acted in an arbitrary and capricious manner "[t]he reviewing court shall" hold the action "unlawful and set aside agency action," i.e., vacate the agency action. 5 U.S.C. § 706(2)(A). Notwithstanding the seemingly mandatory language of Section 706(2)(A), the Tenth Circuit observed in *WildEarth Guardians v. United States Bureau of Land Mgmt*, that "[v]acatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts." *WildEarth Guardians*, 870 F.3d 1222, 1239 (10th Cir. 2017). In that case, the Tenth Circuit declined to vacate the arbitrary and capricious agency action, and remanded the case to the district court to enter an order requiring the agency to revise its determinations. *Id.* at 1240.

In considering the Tenth Circuit's discussion of Section 706(2)(A) in *WildEarth Guardians*, this Court recently concluded that *WildEarth Guardians* "indicates that vacatur under the APA is a form of discretionary relief, akin to an injunction, even though vacatur is not, strictly speaking, a form of injunctive relief." *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 2020 WL 6048149, *124 (D.N.M.). Consequently, the Court stated that "[v]acatur is a form of 'equitable relief,' … and so, upon a 'balance [of] the equities,' vacatur may not be appropriate in all cases." *Id.* (citation omitted); *see also High Country Conservation Advocates v. United States Forest Serv.*, 951 F.3d 1217, 1229 (10th Cir. 2020) (holding in that

---

[2] The APA governs the Court's review of the Service's actions under the ESA. *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1221.

9

case that "[u]nder our *traditional equitable powers* to fashion appropriate relief, which are retained under the APA, 5 U.S.C. § 702, the appropriate remedy is vacatur") (emphasis added)).

The Court, however, acknowledged that the Tenth Circuit has not "specifically addressed the factors to be considered in determining whether vacatur is an appropriate remedy." 2020 WL 6048149 at *124 (citation omitted). The Court noted that even though "the Tenth Circuit offers no guidance on the issue of appropriate remedy here, a number of courts around the country use the [District of Columbia Circuit's] *Allied-Signal* test … and the Court has also relied historically on the test when addressing remedy." *Id.* at *125.

"Although 'vacatur is the normal remedy' under the APA, [the District of Columbian Circuit's] precedents permit a court to remand without vacating the agency's action in limited circumstances." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). In *Allied-Signal*, the District of Columbia Circuit articulated a two-part test to determine when those limited circumstances exist: "[t]he decision whether to vacate depends on [(1)] 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [(2)] the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted).

This Court has adopted "[s]pecific factors suggested by the District of Columbia Circuit" to aid the Court in its *Allied-Signal* analysis:

> (1) the purpose of the substantive statute under which the agency was acting; (2) the consequences of invalidating or enjoining the agency action; (3) potential prejudice to those who will be affected by maintaining the status quo; and (4) the magnitude of the [alleged] administrative error and how extensive and substantive it was.

*Coal. of Arizona/New Mexico Ctys. for Stable Econ. Growth v. Salazar*, 2009 WL 8691098, at *3 (D.N.M.) (citations omitted). Because the APA creates a "presumption of vacatur" if an agency

10

acts unlawfully, the party seeking remand without vacatur carries the burden of overcoming that presumption. *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018).

Following this Court's previous decisions, the Court will apply the *Allied-Signal* test and the above factors to decide whether Defendant-Intervenors have carried their burden of overcoming the APA's presumption of remand with vacatur.

### A. ESA Purpose

Congress promulgated the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species…." 15 U.S.C. § 1531(b). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, *whatever the cost.*" *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 184 (1978) (emphasis added). "[B]eyond doubt … Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174.

### B. Consequences of Invalidating the Service's Critical Habitat Designations

Plaintiffs argue that vacating the critical habitat designations for Units 5 and 6 will "have little effect on the protection of the" jaguar for several reasons. (Doc. 91) at 7. First, Plaintiffs point out that Units 5 and 6 are unoccupied and have only had a total of three jaguar sightings. Second, jaguars do not breed in Units 5 and 6. Third, as an endangered species, it remains unlawful for any person to "take any [jaguar] within the United States…." 16 U.S.C. § 1538(a)(1)(B). Finally, federal agencies must still consult with the Secretary to ensure that any agency action "is not likely to jeopardize the continued existence of any endangered species…." 16 U.S.C. § 1536(a)(2).

Defendant-Intervenors, on the other hand, argue that without a critical habitat designation for Units 5 and 6:

> (1) the recovery functions of the Northwestern Recovery Unit would no longer be effectuated or benefitted by the legal protections afforded by critical habitat designation (AR F000374);
> (2) the physical and biological features essential to jaguars within Units 5 and 6 in New Mexico and that contribute to the jaguar's conservation would no longer be protected by the legal status afforded by critical habitat designation (*id*.);
> (3) connectivity between the United States and Mexico would no longer be protected by the legal status afforded by critical habitat designation (AR F000387, F000394);
> 4) federal agencies would no longer be required to ensure "that any action authorized, funded, or carried out by such agency[,]" such as the issuance of a grazing permit, "is not likely to … result in the destruction or adverse modification" of areas designated as critical habitat within the New Mexico portions of Units 5 and 6. 16 U.S.C. § 1536(a)(2).

(Doc. 90) at 8-9.

The Court notes first that Plaintiffs and Defendant-Intervenors both cite portions of Section 1536(a)(2) of the ESA to support their arguments. Section 1536(a)(2) provides that federal agencies shall consult with the Secretary to insure that an agency action "is not likely to jeopardize the continued existence of any endangered species … or result in the destruction or adverse modification of habitat of such species…." Plaintiffs refer to the jeopardy portion of Section 1536(a)(2) while Defendant-Intervenors refer to the adverse modification portion of that section.

The adverse modification standard "is broader than the jeopardy standard's definition, because the adverse modification standard encompasses actions that 'appreciably diminish the value of critical habitat as a whole for the <u>conservation</u> of a listed species'" while "the jeopardy standard is limited to actions that 'reduce appreciably the likelihood of <u>both the survival and recovery</u> of a listed species.'" *N. New Mexico Stockman's Ass'n*, 2020 WL 6048149 at *96 (quoting 50 C.F.R. § 402.02 (definitions section; emphasis added)); *see also Nat. Res. Defense*

12

*Council, Inc. v. U.S. Dep't of Interior*, 275 F.Supp.2d 1136, 1148 (C.D. Cal. 2002) (stating that "[r]ecent case law clarifies that *adverse modification* has broader scope and application than the *jeopardy* limitation in ESA section 7"). As noted above, conservation encompasses recovery as well as using "all methods and procedures … necessary to bring any endangered species … to the point" at which the species is no longer listed as endangered. *See* 16 U.S.C. 1532(3). Certainly, the adverse modification protection for critical habitat provides the jaguar with greater protection than the jeopardy protection would without a critical habitat determination or even the prohibition against the taking of jaguars.

That said, the jaguar is not at risk of irreversible extinction if the Court should vacate the critical habitat designations for Unit 6 and the New Mexico portion of Unit 5. *Cf. Defs. of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 978–79 (9th Cir. 2005), *rev'd on other grounds and remanded sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) (vacating agency action because maintaining agency action "could lead to the permanent harm of extinction"); *see also N. New Mexico Stockman's Ass'n*, 2020 WL 6048149 at *133 (denying request for vacatur where vacatur of "critical habitat designation could result in the irreversible extinction of the remaining Jumping Mouse populations"). Of primary significance, Unit 5 and Unit 6 are unoccupied and have had only three sightings of jaguar since 1995. Indeed, jaguars breed in the core area 130 miles south of Units 5 and 6. Moreover, Unit 5 and 6 constitute but a fraction of the entire Northwest Recovery Area, which, in turn, is a small portion of the jaguar's total habitat, including Mexico, and Central and South America. In fact, recovery of the species will occur primarily outside of the United States. Although vacating the critical habitat designations for Units 5 and 6 will undoubtedly harm the jaguar to some degree as Defendant-Intervenors describe, the Court finds that such harm is minimal at best. *See, e.g.,*

13

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 916-19 (D.C. Cir. 2011) (vacating critical habitat designation where only four endangered San Diego fairy shrimp observed in critical habitat four years after listing).

Furthermore, the Tenth Circuit's finding that "it is not inconsistent for the Service to find both that Units 5 and 6 are 'secondary' or 'marginal' habitat and that they are essential for the conservation of the jaguar," does not necessarily support a determination that vacatur will significantly harm the jaguar. *See New Mexico Farm and Livestock Bureau*, 952 F.3d at 1232. This finding does not mean that the Tenth Circuit has determined that Units 5 and 6 are actually essential to the conservation of the jaguar. The Tenth Circuit simply leaves unanswered the question of whether "secondary" or "marginal" habitat could be essential to the conservation of the jaguar. In sum, the consequences of vacating the critical habitat designations for Unit 6 and the New Mexico portion of Unit 5 would be minimal.

    *C. Potential Prejudice to Plaintiffs if Status Quo is Maintained*

Plaintiffs contend that they will be prejudiced if the *status quo* is maintained. For instance, Plaintiffs maintain that seeking range improvements, such as installing "corrals, stock ponds, and fences," will "increase[] cost and trouble in getting a federal permit…." (Doc. 91) at 6. Plaintiffs also contend that fire risks will increase "in an already fire-prone area" because the Final Rule "subjects fuel management activities to consultation…." *Id.* In addition, Plaintiffs note that this Court has already found "[t]he threat of direct regulation constitutes sufficient harm to confer standing…." (Doc. 76) at 7. That harm includes the ESA consultation requirement for "the renewal of federal grazing permits," and for "any future planned improvements to their land, such as corrals, stock ponds, additional fencing or other structures." *Id.* Moreover, considering the lengthy procedural history leading to the Service's Final Rule in 2014, Plaintiffs believe a

14

lengthy delay will ensue before the Service finally determines whether to re-designate critical habitat in Unit 5 and Unit 6.

As Defendant-Intervenors observe, even if the Court vacates the critical habitat designations, the consultation requirement under Section 1536(A)(2) remains to insure that agency action "is not likely to jeopardize the continued existence of any endangered species…." Furthermore, Plaintiffs do not detail any concrete harms they will suffer such as what specific federal grazing permits or specific land improvement projects the critical habitat designations will impact. At most, Plaintiffs present hypothetical harms, including that the Service will take an inordinate amount of time to decide whether to re-designate critical habitat. *See N. New Mexico Stockman's Ass'n*, 2020 WL 6048149 at *129 (concluding that harms "to members of the Stockman's Associations[] remain too speculative and unquantifiable"). Finally, this Court distinguishes between harms sufficient to satisfy standing and harms under the *Allied-Signal* test. *See id.* (holding that although "Stockman's Associations show sufficient concrete harms to satisfy associational standing," they must show "concrete harms … resulting from the critical habitat designation" to vacate critical habitat designation under *Allied-Signal*). For the above reasons, the Court concludes that the potential actual prejudice to Plaintiffs if the *status quo* is maintained would be slight.

### D. Magnitude of the Service's Error

Under this last factor, a court may remand without vacatur if "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal, Inc.,* 988 F.2d at 151. Yet, a court should remand with vacatur if "fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015). Indeed, "[c]ourts

regularly decline to [remand without vacatur,] where an agency has committed substantive errors, as opposed to procedural ones." *Otay Mesa Prop., L.P. v. United States Dep't of the Interior*, 344 F. Supp. 3d 355, 378 (D.D.C. 2018) (citations omitted).

In this case, the Service failed to follow Section 424.12(e) (2013). Section 424.12(e) (2013) requires that the Service "must find designation of occupied critical habitat 'inadequate to ensure the conservation of the species'" before "designat[ing] an area as unoccupied critical habitat." *New Mexico Farm and Livestock Bureau*, 952 F.3d at 1228. The magnitude of that fundamental flaw is significant since it addresses the substantive question of whether to designate Unit 5 and Unit 6 as unoccupied critical habitat. Given that (1) only a small portion of the jaguar's range exists in the United States, (2) Units 5 and 6 contain marginal jaguar habitat, (3) jaguar breed in an occupied core area 130 miles south of Unit 5 and Unit 6, and (4) researchers opine "that recovery of the entire species will rely primarily on actions that occur outside of the United States," this Court cannot conclude with any confidence that upon remand there is a "serious possibility" the Service would find that Unit 5 and Unit 6 are essential to the conservation of the jaguar and, thus, constitute unoccupied critical habitats. *See* 79 Fed. Reg. at 12,574. In other words, it is unlikely, and certainly not a forgone conclusion, that upon remand the Service would re-designate Unit 5 and Unit 6 as unoccupied critical habitat. Consequently, the seriousness and extent of the Service's error is substantial.

*IV. Conclusion*

The Court concludes that while the purpose of the ESA and the slight prejudice Plaintiffs may suffer if the *status quo* is maintained favor remand without vacatur, the minimal consequences to the jaguar associated with vacatur and the significant magnitude of the Service's error in designating Unit 6 and the New Mexico portion of Unit 5 as unoccupied critical habitat

favor remand with vacatur.  Considering that vacatur is the normal and presumed remedy under the APA and considering the above equitable factors, on balance, Defendant-Intervenors have not shown that the disruptive consequences of vacating the critical habitat designations for Unit 6 and the New Mexico portion of Unit 5 outweigh the seriousness of the deficiency in the Service's unoccupied critical habitat designations.  For this reason, the Court grants Plaintiffs' request for vacatur.

IT IS ORDERED that

1.  Plaintiffs' request to vacate the Final Rule as it relates to Unit 6 and the New Mexico portion of Unit 5 is granted; and

2.  a separate Final Judgment and Order of Remand will be entered.

_____
UNITED STATES DISTRICT JUDGE